May it please the court, my name is Jennifer Goldstein. I'm the counsel for the EEOC, the appellant in this case. I'll be sharing my time with the attorney for the interveners and we'll both be reserving time for rebuttal. Your Honor, just to give me a hint, how would you like to split your time so I can kind of help you do it? I think right down the middle. And how much time do you want to save? I'd like to save three minutes. So 17 minutes divided in half? No, sorry. Seven for me and then three for rebuttal for me. Two for me, Your Honor. We'll give that a try. Okay, I'm sorry. I'll try to do it myself. Life is complicated but we'll try. Okay. Well, Your Honors, the one basic point that I want to make today is that there is considerable evidence that Tom Harvey treated the three women in this case differently than he treated the male employees. The first difference was the frequency. There was evidence that Tom Harvey was abusive towards the women far more often than towards the men. Carol Christopher, for example, said that, quote unquote, every day she experienced some kind of abusive behavior from Harvey, whether it be the screaming and yelling, the shaking his fists in her face, or pointing a finger at her and yelling at her in order to intimidate her. Julie Benn said that her work environment was hostile on, quote unquote, a daily basis. Carmela Chamara said that Harvey's abusive behavior was so frequent that she felt that every time she could hear his footsteps walking down the hall, her hair would stand up. She felt like she was working with a ticking time bomb. Now, the men talked about Tom Harvey in a very different way. Mark Jones, for example, said that Harvey raised his voice with him only on a couple of occasions for a very short time. He said, I haven't experienced much anger from Tom Harvey. Don Oberg said that Harvey raised his voice with him one time. James Alter talked about only one incident when Harvey yelled at him. And even when Tom Harvey did yell at the men, there was a difference. With the men, Harvey might yell, but the people in his office described, in the office, described it as more like bantering. At the end of the day, they described it, Harvey would be in his office with the men laughing and joking. It was different with the women. At the end of the day, there wasn't laughing and joking. What the women described was nasty, abusive, physically intimidating treatment of them by Harvey. Again, for example, Christopher described Harvey screaming and shaking his fist right in her face. Ben described her evaluation conference when Harvey was screaming and banging his fist on the table and then Chamorro said it was his custom, it was Harvey's custom to pump his fist at people in order to make a point. Can I ask you a question right there? On the treating women differently than men, if he jokes and laughs with the men after, you could say he screamed at the women and then he screams at the men, but he jokes with the men after. Would that be the same as if he was screaming at the women and saying, you're women, I'm going to scream at you louder. He never said that, but his actions would show that his attitude toward them versus his attitude toward the men was different. That's where the 1983 kicks in. The point is that he wasn't overt in saying, I don't like you folks, I don't like what you do, I don't like women, but you're relying on the fact that if we look at the record and the treatment of each one, even though he's going to yell at everybody, that it was different and toward the women it was very different. And that's exactly right. The context is everything and that's what the Supreme Court said in on call. They said that you've got to look at the social context, the relationships and what's going on to try to figure out whether treatment is because of sex. Was there any significance to the fact that somewhere in the record I remember that it was said that most of the travel was done by the men. So there was some sort of illusion there or some sort of talk there that because they're there all the time they're going to get more yelling or something like that. Well I think that's an important point for two reasons. The point, the reason that we made that point primarily was to show the severity and the pervasiveness. They're there every day, they're getting this every day. I think that the implication of your question though would be that maybe it's not because they're women, it's just because they happen to be around. And so that would, and I think a jury theoretically could find that, but I think there was considerable evidence that that's not just what was going on. Because there were men who were in the office and the evidence indicates that when they were there he did treat them differently. He did, he yelled at them less, they talked about, most of the men talked about being yelled at, almost not at all. And then when they were yelled at, as you pointed out, the context was very different. There was the laughing and the joking with the men that wasn't true of the women. You know, again, I would say a jury could say, well, it was because the women were around and that was the reason, it wasn't their sex. But I think there's considerable evidence that it was because of their sex, that there was a difference even when the men were around, that that, that he was treating the women differently. He picked on the women, he abused them in a way he didn't, he didn't towards the men. Is there case law, and I, and I realize I'm pushing you past the argument you've been making so far this morning, is there case law that would support a cause of action where the perpetrator does things, in a sense, equally to men and women, but it's clear that it has a different impact on men and women. Is there, is there case law that says that, that gives you a cause of action? Yes. Before I discuss that, I do want to emphasize that that's, that's really not, our argument really is that... I'm pushing you past the argument you have so far made, I recognize. And they, they were affected more because they were treated differently. Yes, yes, I understand that. Yeah, I, well, Ellison does talk about how treatment, that you have to look at it from a perspective of a reasonable women, woman, and that treatment that a man might not find abusive or intimidating, a woman might. So I think Ellison provides support for that. And I think also Steiner, in addition, although Steiner, primarily the court initially held that, that the content of the treatment was different, the court said, even if it were the same, it's possible, I think relying on Ellison v. Brady, that, that women could have a claim based upon the effects of the behavior on them. It really depends on the content, I would say, of the behavior. I was concerned about that, because that's a very, sort of a, a very difficult issue even in our circuit. And if you had, say, a woman employee here and a man employee here, and he decides he's going to take it out on both of them. Yeah. And so he takes it out on the woman first, and then he says the same thing to the man they're working. And the woman takes it more harshly, or maybe, than the man. But if we look at this record, as I understand your argument, we don't have to go there because of the way of what he did with the men generally, i.e. joke with them after work. Right. And it seems to me that's your argument. That way we don't have to wander down that road about what, whether or not a reasonable woman, analyzing each one of his encounters. That's right. That's exactly right. Is that your point? That's exactly right. That, that's our primary argument, is that he actually treated them differently. Yeah, yeah. And they didn't really, except for one man, the only, there was only one man, the Jeff Collodier, who described an incident where Harvey, Tom Harvey, was screaming in his face, getting his fist in his face, in the same way that he was with the women. And also did, did, help me out on this one, because this one I kind of lost. At one point when the women, I can't remember which woman it was, tried to come back and try to express her problem with what he was doing, he made reference to his prior employment, where he said, well, you know, I think it was like, kind of, play your best shot, because a woman tried it or something like that. In Mississippi, that's right. And that was the first time that he actually got into the difference between men and women, maybe. Right. That's, that's right. He did say that. And that was definitely referencing to the Mississippi, a complaint made by a woman. He said a woman tried that in Mississippi and it didn't go anywhere. Yes, right. That's right. Now, if you'd like to save some time, now's the time to do that. Okay. Well, then I'll do that.  Thank you, Your Honor. Your Honors, may it please the Court. My name is Terry Vandenberg. I represent Carol Christopher, Julie Band, and Carmela Chimura, the intervening plaintiffs in this case. And I wanted to follow up on the discussion about the difference in treatment between women and men, because that's really what this case boils down to. Oncology is clear that where you offer comparative evidence of treatment between the sexes, that raises an inference of discrimination that certainly gets you past summary judgment. The evidence in the record of, quote, yelling at men is barely a sliver. The evidence involving Mark Jones, who was an NEA Alaska employee, he testified to a couple of occasions when Harvey first came on staff and that the period of raising his voice was very short, and I believe we were able to resolve the matter by talking it out. That's at the excerpt of Record 324. That, I would submit, is considerably different than Mr. Harvey's interactions with women. No mention of yelling in Mr. Jones' testimony. Another incident involved Mr. Alter, Jim Alter, who described some yelling on one occasion about a phone message that had been left. Mr. Alter did not indicate that this was a traumatic or even significant event in his workplace experience. A female employee testified that she saw Harvey raise his voice to other male employees, but no details were offered, except for one of the employees giving as good as he got. And that's at the record, Excerpt to Record 328 and 329. The primary incident cited by NEA Alaska involving Mr. Cloutier occurred, according to Mr. Cloutier, sometime between May and September of 2001, and that is the excerpt of Record 568, which is well after the filing of the EOC charges by these women, well after both Ms. Christopher and Ms. Chimura had left the workplace, and well after the period of discrimination described in their EEOC charges. In this record, therefore, there is testimony from two men concerning perhaps three incidents of raised voice interaction with Harvey, only one of which was described as yelling. Can I stop you there just a second? I misquoted before. I was saying 1983. I meant times seven, which I converted it. I also remember, if we're going to get into this, when we're analyzing Title VII and this hostile workplace, I also seem to remember in the record, and this is what's going to have to somehow go in our decision, so we can, whichever analysis we do, it seemed to me that some of the men testified about how their treatment differed from what they thought the women's treatment was. Did I misread that somewhere? There was testimony from witnesses, I believe, outside of those interactions. I thought there was testimony from men that would substantially, instead of just saying that we look over and see men joking, that there were some men that observed the difference. Right. Now, that seemed to me sort of significant when we're talking about women being treated differently from men when the men themselves noticed the difference. Yeah. So what I'm speaking about is purely the abuse aspect of it, is sort of disabusing the court of the notion that there's evidence in this record that these sexes in this workplace were in any way treated the same. We've offered quite a bit of evidence on the abuse of treatment of women in this workplace, yet this record reveals only one description by a man who said that Tom Harvey yelled at him during this period, during the period of discrimination. I would submit that that is significant. No, I guess I'm going to the next step. Okay. I thought I read in the record, and it may have been in the briefs, where a man employee said he observed the treatment of the women in the screening, and he felt that the treatment toward the women was harsher than the men. That was Mr. Cloutier. Cloutier. Okay. All right. Mr. Cloutier testified that he saw, I believe, a dozen interactions between Mr. Harvey and Ms. Christopher that he described as raised voice interactions, yelling, abusive. And there was obviously testimony from my clients in the record about the experiences that they had. I mean, again, I'm sorry. No, no, that's all right. I wanted to bring up another one, and it may not be significant. The employees union themselves then, in order to deal with this man, apparently grieved, as I understand, and they also had whistles that they would blow. Yes, Director. Now, was that across both genders, or was that just the women in the grievance and the whistle business? It's my understanding that only women had whistles. And did the women grieve that produced? They did file a grievance, right? They did not. Ms. Christopher did towards the end of her employment. Were the whistles an independent action? It was an independent action, as I understand. It was an independent action of a union representative in response to this abusive behavior that the women were undergoing. Okay. Now, both the district court in any Alaska would have the plaintiffs held to a higher standard than showing different treatment of women and men. The district court lamented in its decision that the plaintiffs had not shown that Tom was sexual animus towards women as women, and even referred to absence of evidence that the defendants, quote, were formerly all male and that plaintiffs were members of a female minority of employees that Harvey sought to drive out of the organization so their positions could be filled by men. With all due respect to the district court, that test simply had nothing to do with the allegations made in this case, or from what I've been able to gather, any applicable test in the area of employment discrimination. The only reference in the district court's discussion to any claim made in this case comes at the tail end of a sentence in the ruling, when the court casually states that Harvey yelled at men as well as women. Given the disparity of treatment shown in the evidence, this statement was a totally inappropriate and meaningless observation on the part of the district court. Now the district court, I was just checking the notes quickly here, the district court noticed that the women may react differently from the treatment than the men, but I don't see where the district court indicated that the men were treated in a little more gentle fashion after work, and that seems to be missing in here somewhere. And that's because the district court really did no analysis in its ruling of the difference in the treatment of men and women in terms of abuse, other than this cryptic reference indicated that Harvey yelled at men as well as women. See, that's what makes this case a little bit different, and it isn't the reasonable woman case, it's the difference between men and women that makes this case a lot different from what I can see. Well, and that we don't have to go to Ellison. We don't have to go to what the perception is. We've got evidence of different treatment. On your theory of the case, this is an easier case conceptually. Well, it's an easier case in terms of because of sex. I think the district court was looking for direct evidence of discrimination. It's looking for a comment by Tom Harvey directed at women, derogatory comments towards women, sexual lust, things of that nature. We're entitled to prove our case by circumstantial evidence. Let me save you some time. I think we have your argument well in hand. Let's hear from the other side, and we'll give both of you a brief period to respond. Very well. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, my name is Leslie Longenbaugh. I represent NEA Alaska in this matter. I'm with the Juneau, Alaska firm of Simpson, Tillinghast, Sorensen and Longenbaugh. In granting the ---- Excuse me. Could you keep your voice up a little bit? Oh, yes, I will. Sorry. Thank you. Let me pull this forward. When the Court ---- when Judge Singleton granted summary judgment to the defense here, he issued a simple ruling, as the Court has before it, that the plaintiffs had failed to make a case that there was discrimination here because of sex. The Court's de novo review should come to the same conclusion. The EEOC and the plaintiff intervenors have argued that the Court should take into account frequency and alleged differences in the way Mr. Harvey may have treated men and women in the workplace. You've noted that the EEOC did point out that men traveled constantly out of this office. It's also in the record that the office was, in any event, mostly women. So the fact that women would be experiencing more blow-ups from a supervisor would not be at all surprising. I am still plowing through the record because I think this is a very, very intensive factual thing, to go where the appellants have asked us to go. And I guess what I'm concerned about is the evidence that may or may not be in the record relative to how the men were treated around the yelling, i.e., he yells at them all day and he jokes after work, and sticking strictly with the difference of treatment between men and women. Just keep it at that. What else is in the record, from your point of view, that would show that the men and the women were treated the same? Now, the men are out of the office, so they don't get as frequent. But how do the yelling incidences equate so that there's no difference, in your view, with regard to the record as you read it? Okay, thank you for asking that. With regard to the incident that Mr. Couture described, for example, he described more than one. I don't think that anyone reading this record could expect that he and Mr. Harvey went for drinks and banter after work. Following the incident he described, he said, although he's taller than Harvey, whom he described as fairly short, he was yelled at numerous times. He testified that one encounter, quote, scared the hell out of him, left him feeling shaky and trembling, and this is important, was way beyond what he had seen Harvey engage in with appellant Carol Christopher, who was the only one he, Mr. Couture, had ever seen Mr. Harvey yelling at. So this isn't a sensitivity thing. He's saying, I felt very much imposed upon. Now, that's one. What else do you see there? Well, with regard to the whistles, I just want to make really plain that the record states, and I'm reading now from the EEOC's opening brief, page 13, the fear of the women at our office was so great, Couture stated, that the union representing NEA Alaska employees purchased and distributed a whistle to each union member. That's what the record reflects, correct? Yeah, I didn't remember that the whistles. It was not women only. Yeah, I wasn't sure. So your position would be that the whistles from the employees' union went to everybody. Right, it was part of a union action. But of course, the very statement you read says the fear of the women was so great that everybody got a whistle. Well, that was the rhetoric of the EEOC that I was just reading. We've still got to live with what's said there. In other words, whether it was fear of the women or not, everybody got a whistle. Everyone got a whistle, and the record also reflects that they were never blown, and the only time there was any reference to blowing one, Mr. Couture asked someone to blow one during the event I just mentioned with the shaky trembling, and he doesn't think anyone actually blew it for him. We've got to review that record very carefully. Are you arguing that if you have an equal opportunity bully as a supervisor, he bullies everybody, but in this case, women are claiming that they're more vulnerable to his type of bullying. Why isn't that a hostile workplace? Well, that would go not to the because of sex element, but to the severe and pervasive. Well, if the women are more vulnerable to the type of behavior that this bully likes to indulge in, and he finds them more vulnerable so he has more fun bullying them, why wouldn't that be a fact question that a jury or a charge of fact could say creates a hostile workplace for women? Your Honor, there's nothing in the record that would suggest that Mr. Harvey found women more vulnerable or enjoyed bullying women. Well, the record indicates that some of the women seem to be more vulnerable than the few men who did happen to drop by once in a while. The record would indicate that these three women who brought this lawsuit do say that they were made tearful sometimes. But tearfulness, as I say, would go to severity and pervasiveness, not to whether there was any activity on Mr. Harvey's part that was because of sex. Wait a minute. There seems to be a basic problem with the because of sex as it's used by the district court, and it may or may not be a problem shared as we're talking in the courtroom. I have trouble understanding the district court's opinion and his use of because of sex. It sounds as though the district court's view of the law is that Mr. Harvey had to have a conscious notion of, I don't want women around here and I want to treat them worse. I don't think that's the law, is it? It's enough that he simply treats men differently from women and treats women more adversely than men, and if the difference in treatment is enough, bingo, you've got a Title VII action. Isn't that right? Well, if it were enough. But in all the cases that the EEOC and the plaintiff intervener cite, the difference is evident in the way, for example, in Steiner or any of the cases that they cite, Klein or Kopp, the supervisor in those cases treated women in a clearly sex-based manner. Now, what do you mean by sex-based? Would use words like bitch or other epithets. But that's not required, is it? That is to say, let me assume that no sexual words were ever used, and that may even be true in this case, but let me assume that no sexual words were ever used, no touching of body parts was ever done, but what we have is, and I'm just asking you to assume rather than to conceive factually, that the defendant yells at and makes life more difficult for the women than for the men in the office. I think that's a cause of action, the Title VII, if the difference is enough. Isn't that right? Well, I think that it, I don't think so, Your Honor, because I think that in this instance you have very few women around. I'm not talking for a moment about this case. I'm asking you to assume that there has been different treatment of the men and the women. None of it involving sexual words or sexual touching or any of that. It's just different treatment, and it is more adverse to the women than to the men, and the difference is substantial. Does that state a cause of action under Title VII? And in your assumption, are there the same number of men and women? There need not be. Need not be. I'm quite willing to assume that there are. Okay. If the difference were vast enough, then possibly, Your Honor. I just, I can't conceive of that in this case, but I guess there would be an occasion where, you know, if you are slamming women's hands in car doors all day long and taking men out for drinks, it might appear at some point to be that maybe you don't like women, but that's so far from our facts. Well, but then you re-inject don't like women. I'm not sure I see a subjective. Or are treating them differently. I don't see a subjective requirement here of animus toward women in the sense of, I don't want women in the workplace. I think it is enough that we see serious differences in treatment between men and women by the employer. Isn't that right? Well, as I say, serious differences. I wouldn't concede anything like that in this instance. I want to draw you from there to a point that I really get in trouble with in this case, and I still have a record problem still reading. As I read as far as I've read, I find something like this. It seems as though the supervisor goes to an employee, and let's say the employee is mailing, and he just goes ballistic over the mailing. He just goes nuts. And then when he goes to the person, I'm not saying this to the actual fact, a person who's a receptionist, he goes ballistic about the receptionist. So he's zeroing in on the employee on that employee's specific job description. You didn't do the mailing. You're not the reception. You're not taking the phone calls right. So regardless of who this person is, regardless of anything, he is zeroing in. I mean, you're going to do your job right or else. Now, if that's the case, and if there's more women there and they're doing more of the jobs, then if that's what he's doing, in fact, the record shows, he's focusing in on each one's job. Now, if you get over on the men's side, it seems as though he did the same thing. In other words, the guy's supposed to travel or he's supposed to do whatever. He's got to get a report out. I don't remember all those facts, but it seemed to me every time he yelled, he yelled at the person because of what they were doing or not doing. Now, I may be wrong. That's the way I perceive the record. Now, if that's the case, then the next step has to be that after he's through with all that business, that he does something extra toward the men. Regardless of how each one of those persons takes this meeting, he does something extra toward the men to show that he's favoring, that he's treating the women more harshly, and there is where you jump into the gender sex thing because you've got to show the difference in your criticism of your job performance, regardless of your gender at that point, that then you treat the men a little bit differently, even though they all were being berated because of their performance of their job. You see what I'm saying? Yes. Now, where would you show me to go in the record as I'm continuing to read to show that these men got it after everybody got beat up because of the way they're not doing their job, where you would go to show that the men were not treated any differently after that? Is there anything in the record? You're saying there's nothing about joking afterwards. There's nothing about placating and saying, gee, I'm sorry I yelled at you. You're still doing a good job. There's nothing in the record like that. Well, Virginia McKinney, for example, in her testament, I'm trying to separate what's in the record from all these depositions I sat through, Your Honor, and I can't remember. Are the depositions not on the record? Some depositions are in part on the record. There are dozens in this case. Well, I would say I'm having a great problem with this record, and the big problem about this case is going to turn on these facts, and that's the big problem. Yeah, yeah, and so I hate to state anything that I'm not certain is on the record. Did you run across the Eighth Circuit case of Copp versus American Health? Yes, Your Honor. We don't have a lot of Ninth Circuit cases in which there was kind of equal opportunity abuse, but a hostile workplace was found. In the Eighth Circuit, approximately ten female employees were involved and about four male employees, and I think the court held there that there was a fact question about whether the work of hostility was sex-based or had an impact on the women more than on the men. Why wouldn't that apply here? Well, the Copp case from the Eighth Circuit in 1993 was about a male cardiologist who treated female staff in a sex-based manner over ten years. He threw charts at them. He called them epithets, such as I've mentioned, and the only comments he made toward four men were four separate occasions where he swore at them, very mild occasions. The cardiologist in Copp preferred that women not look him in the eye. Apparently, according to the case, it was a cultural issue for him. So that the female staff in his operating room were not to look him in the eye. That's very sex-based and different than our facts here. Did you run across the Seventh Circuit case, Amory School District? I'm sorry, Your Honor. The Amory School District case in the Seventh Circuit. No. There, they reversed the summary judgment on a hostile work environment claim, holding that there was a fact question there, whether it was because women were more vulnerable than men. The courts aren't supposed to reflect on their childhood memories of sixth-grade schoolyard bullies. I can remember one case where the bully was a female. She was bigger than the boys at that age and pushed them around quite a bit. I don't think it was sex-based there because it was a size-based abuse. But you have all kinds of bullies who like to push people around. And some people are more vulnerable than others. What bothers me as an old common-law lawyer from Oregon is that questions like that usually went to the jury as to what was reasonable or unreasonable in deciding whether women were more likely to be abused in that workplace than men. Why is that a fact question in this case? Well, I think, Your Honor, in this case, what Judge Singleton found and what I believe is that because there is no evidence whatsoever in the record that anything Mr. Harvey did to anyone was based on sex or because of sex, that that just simply didn't make it over the hurdle. Now, what do you mean, or you're really reading the district court's order, what do you understand the district court to mean by because of sex? Or actually because of their gender is the phrase, but your paraphrase captures it. Well, I guess I was quoting the Oncology Court. Could you, Your Honor, tell me how that's pronounced? I've heard it two ways here today. Well, I don't know. I pronounce it Oncology, but I mispronounce a lot of words. I was thinking the Italian. Because of sex is found in the Oncology case, so that's what I was going with. What do I understand him to mean? I guess I understand him to mean the same thing I saw when I wrote the summary judgment motion and attended the record, which is that there is no indication in this case that Mr. Harvey treated women in a disadvantageous way. We have testimony from Ms. Bend, for example, that although he picked on certain women and certain men, both Ms. Bend and Ms. Christopher testified that he targeted men and women both, that she listed four or five names of women, Ms. Bend did, who he got along with great in the office. So there was no implication there in the record, and I think that's what the court was saying. My problem, in a way, is the use by the district court of the word no evidence. Now, of course, he's trying to fit into the summary judgment standard, but it seems to me that there is at least some evidence. Well, there's enough to get past summary judgment, but there seems to be some evidence. I mean, some of these plaintiffs are simply saying in their depositions, so it's not allegations, that they were treated differently and more adversely. They're saying that. Right. So there's evidence. Okay. He may have – you know, when I stood up here, I did not introduce my co-counsel, Mr. Collins, and I also did not reserve time for him. Would he like some time? He would like some time. I'm just now looking at the clock. How much time would he like? He would like five minutes, and I've only left him two and a half. No, he was sending up flags. He's practically over there with smoke signals. He'd like seven, but he's settled for five. Why don't we give him five minutes, and we won't restrict terribly tightly the rebuttal time? Oh, I apologize to the court and Mr. Collins. Okay. Well, we kind of laid you down a path, too, so. Listen, look, we're not terribly pressed for time. We'll make sure everybody's had his or her say. I appreciate that. Okay. But you were asking me something about the court's – Let's hear from your co-counsel. Oh, good. Let's do it. He's getting too nervous. We've got to get him up. Yeah. We'll make sure he gets enough time to say his piece. I'm nervous because I've been trying to figure out how to say ten minutes' worth in five minutes without talking fast. Talk for five, and then we'll see where we are. May it please the court, I'm Jeremiah Collins, representing the National Education Association, NEA, the national organization. The EEOC and the plaintiff intervenors acknowledge that NEA is a separate entity from NEA Alaska and that because NEA is conceitedly not the employer of the intervenors, the only possible ground available for a Title VII suit against NEA would be if the conduct of which the plaintiffs are complaining was the result of interference by NEA in the relationship between the individual plaintiffs and their employer, NEA Alaska. No, the district judge didn't get to that question, did he? That's correct, Your Honor. And EEOC, as we have both noted in our briefs, we think it would be appropriate for the court to reach it. It's been fully briefed. It's a question of law. It's going to be disclosed. And, frankly, my client has been spending a lot of money in a case where, in our view, there should never have been a claim permitted in the first instance because of the failure to name them in the charge, which I'll get to in a moment, hopefully. So we would ask the court, it is within the court's discretion, whether to reach it. The case law in this circuit on the interference doctrine simply doesn't support a cause of action here. In the lead case sustaining a claim on this basis, the Mexican-American educators case, this court emphasized that the state of California, which was not itself the employer of teachers, had dictated to the school districts who were the employers that they could not hire the plaintiffs in that case or other teachers who didn't pass a test that was allegedly discriminatory. The school districts, the employers, had no choice. As the court put it, the state had the theoretical and practical control over who could teach in these school districts. And, therefore, what the court said is it would be a loophole in the statute if a claim could not be allowed against the only party that was responsible for the wrongful behavior. That was also true in the only other case where this court has recognized a cause of action for interference. That's the Gomez case. And as the court more recently explained in Anderson v. Specific Maritime, which is a hostile work environment case, the key under this doctrine is that the non-employer must be in a situation of theoretical and practical control over the relationship between the employees who are complaining and their employer and must use that control to interfere with the relationship in a discriminatory way. And so in that Specific Maritime case, because the employer association that had been sued was not itself responsible for supervising or disciplining the individuals who allegedly caused the harassment, this court held there could be no claim, even though that association did have certain powers to take action against the discrimination. This court said that that inaction could not be treated as interfering in the relationship between the actual employer and the employees. So what did NEA have in its relationship at all with Harvey? Now, he did become the chief executive of NEA Alaska, and he had a relationship in another venue. Now, what was the relationship between he and Harvey that we'll find in the record here? The relationship between NEA and Harvey was that Harvey had been a participant in what's called the Uniform State Executive Director Program, whereby NEA provides financial support to generally the smaller states in employing their executive directors by setting up an arrangement where they will be designated as NEA employees, meaning they're eligible for NEA benefits. But under the terms of that program, as quoted at page nine of our brief, it explicitly says that the state will have the authority to direct and determine what the executive director or the other employees in this program will do. So NEA has certain, very limited rights to insist on certain things as a result of putting up money in this program. But as we've explained in the brief, if you go through all of those provisions, none of them amount to giving NEA any authority to dictate in any way what that individual will do in his dealings with staff. So when the plaintiffs allege that NEA, because Tom Harvey and, for that matter, Vernon Marshall, the executive director, were in the USEDP, NEA could have told them how they should behave towards the plaintiffs. That is simply wrong on the undisputed evidence. The guidelines for the program say NEA can't do that. The testimony of Vernon Marshall, which is uncontroverted, says that the only body that he, Vernon Marshall, had the authority over the staff, including both Harvey and, equally important, the plaintiffs in this case, that only the NEA Alaska board, elected by the NEA Alaska members, he was answerable only to them. He was not answerable to NEA. And further, it's undisputed, and we set this out chapter and verse at pages six to nine of our brief, witness after witness testified that not only has it always been the understanding of NEA and the state affiliates that when an employee is in this program, NEA has no authority to control or dictate his behavior or to supervise him or to discipline. Not only is that the understanding, but never once has NEA stepped in to take action to tell one of these individuals how he or she should be conducting his or her job on any basis, for any reason, in any state, at any time. So we do not have, in the ongoing relationship, such as it is between Harvey and NEA, we don't have a situation where NEA has, as this court described it in the Mexican American Educators case, theoretical and practical control over the circumstances. The records show that NEA, though, helped in getting his placement at NEA Alaska and that he had been in other states, but that was the involvement of NEA with regard to getting him jobs. Is that it? It's undisputed that NEA Alaska asked if NEA knew of anyone who might be available. NEA said, we know this person named Tom Harvey. Harvey was still being paid under the U.S. CDP program. It is undisputed, though, that NEA Alaska had the sole authority and made the decision that Harvey was the person they wanted. It's absolutely undisputed that NEA did not say to NEA Alaska, you must take this person, and undisputed that NEA had no authority to do that. So again, we're looking for, is there interference by NEA so that we can have a loophole? Is there any evidence that NEA, in some fashion, encouraged NEA Alaska to take Mr. Harvey? There's no evidence in the record in that vein at all, Your Honor. And then Harvey was elevated to executive director. Is that it? Well, initially he was brought in as an interim assistant executive director. He then became the permanent assistant executive director without any NEA involvement in that decision. And then, subsequent to the events in this case, he eventually did become executive director. Now, who participated in the decision to make him the executive director? In the record? The executive director position is after the events of the case. If you're referring to the permanent assistant executive director position. You mean it has no bearing on your issue on NEA's involvement? Well, there's nothing in the record about NEA played no role. What is in the record is that NEA played, when Harvey was selected by NEA Alaska as its interim assistant executive director, an NEA rep was asked by NEA Alaska, do you know anyone who might be available, mentioned Harvey. NEA Alaska, according to Marshall's testimony and all the other testimony, made the decision after interviewing, well, made the decision Harvey is the person that we will take. It's also in the record we cited in our brief that when, about a year later, NEA Alaska decided to make Harvey its permanent rather than interim assistant executive director, that NEA played no role in that. That was a decision by NEA Alaska. I can also tell the court, although it's not in the record, the later decision of NEA Alaska to make Harvey its actual executive director was not with any NEA involvement. And the last point I want to make to the court, if I could very briefly, is what I've been trying to indicate is we don't have a situation here where NEA interfered with the relationship between these individual plaintiffs and their employer. Whatever can be said about NEA's role with the USEDP, with Harvey coming to Alaska, is not interference, as this court has defined that term. And it creates no loophole in Title VII to say that the only proper defendant here is NEA Alaska, which has never denied that it had sole authority to control Harvey's actions. In this respect, the case is very much like the Wrighton case written by Judge Goodwin for the court, where it was found in that case that the employee, the individual who was the alleged discriminator, was employed by a contractor named Metro. I think we know that case, and you've just had your 10 minutes. It's not quite Andy Warhol's 15, but you've had 10, and I think we have your argument well in hand. Thank you. Just very quickly, I want to, in response to Judge Brunetti's questions about the record, I just want to give a few record sites that I think might be helpful. Excerpt of record, page 209 to 211, Carol Christopher talks about Harvey's relationship with male employees, how they would be laughing. 295, Julie Benn talks about Harvey's relationship with Clodier. 573, Clodier states, and this is a quote, it was the fear of the women at our office that Harvey would be yelling and abusing them. And at pages two and three of our reply brief, we talk, we summarize the way he treated the men in the office. Turning to NEA's argument, just very briefly, Judge Fletcher, you asked whether there was, NEA in any way encouraged NEA Alaska to take Harvey. We would submit that the fact that NEA, this was a unique situation. The fact NEA was paying, NEA and the Mississippi Association were paying Harvey's salary completely. NEA Alaska was getting Harvey for free. While they may not have explicitly said, take this guy, take this guy, they're saying, here's a guy, you get him for free, so we would submit that is an encouragement. Why were they paying his salary when he was working up there? Why were they paying, in your view? Why was NEA? It was because he had been working at Mississippi and it was such a disaster there. They had a three-year contract with him. So that's your evidence. You're arguing that NEA is moving this man from one parish to the other. Essentially. But this is a unique situation. It's not the typical. That's right. And there is some evidence about how he's on assignment to Alaska. Now, how long did that relationship go on where NEA and Mississippi paid his salary? It was a year and a half from the time that he started working at NEA Alaska. Okay. And that was during the temporary and also the permanent assistant job? Not the permanent. When he became permanent, he was no longer subject. At that point, NEA Alaska was paying his salary. And your point is being they're paying the money and they're the employer? Well, it's not just that. It's just the unique circumstances. That is certainly paying salary is a factor in control, but it's also the other evidence. I mean, the record just shows that the money that caused him to be paid came from this source. Right. It shows that. There is no district court ruling on any part of this. To me, it's premature for us to be expressing a lot of opinions about what should happen if this case goes back to the district court. Yeah, it certainly could just defer because there is a lot of record for the court to go through, and it certainly could wait and resolve that question. I'll save the rest of my time. Real briefly. On the NEA appeal and the question that came from the panel on the relationship between Harvey and NEA, it's very simple. It was employer, employee until August 31, 1999. The relationship between the executive director of NEA Alaska throughout his time there was employee of NEA. The case, the most recent case of Anderson talks about a peculiar control over the workplace, and we would submit that if your employees are supervising the workplace, one of your employees is the harasser for a year and a half of this, that that is the type of control that kicks in Sibley and its line of cases. Very briefly, on the Whistle issue, the record will show at 573 that the Whistles were issued in February 2001, which was, again, after the period of discrimination that is at issue here. The record will reflect that Carol Christopher left in February 2000, Carmelo Chamura left in August of 2000, and Julie Ben's EEOC complaint has the period of discrimination ending at March 27, 2000. So the Whistles were after that. Thank you very much. I think we've now allowed everyone to say their pieces as much as they needed to. The case of Christopher's National Education Association, Alaska et al., is now submitted for decision. We thank you for your attention.
judges: Goodwin, Brunetti, W. Fletcher